Filed 6/30/26; certified for partial publication 7/28/26 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E084273 |
|     v. | (Super.Ct.No. RIF2003935) |
| STEVEN DANIEL CARRILLO, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Jerry C. Yang, Judge. Affirmed with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Daniel Rodgers, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Steven Daniel Carrillo of first degree premeditated murder and attempted premeditated murder. (Pen. Code, §§ 187, 189, subd. (a), 664; unlabeled statutory citations refer to this code.) The jury also found true a number of enhancement allegations and special circumstance allegations, including a hate-crime special circumstance. (§ 190.2, subd. (a)(16).) Carrillo argues that the People's gang expert violated the California Racial Justice Act of 2020 (RJA) by using racially discriminatory language about Carrillo's race, ethnicity, or national origin and exhibiting bias or animus towards Carrillo because of his race, ethnicity, or national origin. (§ 745, subd. (a)(1), (2); Stats. 2020, ch. 317, § 1.) He also argues that the trial court (1) admitted improper opinion testimony about a victim's honesty and (2) erroneously instructed the jury on the motive element of the hate-crime special circumstance. He lastly argues that the abstract of judgment and the sentencing minute order do not accurately reflect the court's oral pronouncement of judgment. We direct the court to correct the abstract of judgment and the sentencing minute order, but we otherwise affirm.

BACKGROUND

I.    *Trial evidence*

The shooting underlying Carrillo's convictions took place in October 2020. The murder victim was Derrion Thomas, and the attempted murder victim was Isaiah S. Isaiah and Thomas were best friends.

A.    *History of gang and racial violence in the area of the shooting*

East Side Riva is a Hispanic street gang in Riverside, California with roughly 500 active members. There are a number of cliques within East Side Riva, including Clique

Los Primos, which is also known as CLPS or Primos. Carrillo is a member of East Side Riva and CLPS.[1] His gang moniker is Wino.

The Mexican Mafia is a Hispanic prison gang founded in the 1950's. The prison gang acts as a parent organization and exerts control over all Hispanic street gangs in Southern California. The Mexican Mafia forces the street gangs to pay taxes and disciplines their members when they are incarcerated. East Side Riva pays taxes to the Mexican Mafia.

The 1200 Block East Coast Crips (1200 Block) is an African-American street gang in Riverside, California. Georgia Street Mob, or GSM, is a clique within 1200 Block. East Side Riva and 1200 Block occupy or claim the same territory. According to the People's gang expert, Detective Trevor Childers, the area has a history of racial violence that grew out of a "beef" between East Side Riva and 1200 Block in 1991. At the time, East Side Riva and 1200 Block were cooperating to target rival gangs in other neighborhoods of Riverside. The Mexican Mafia learned of East Side Riva's alliance with 1200 Block, and the Mexican Mafia was not happy, because the gang did not cooperate with African Americans. The Mexican Mafia punished East Side Riva by "put[ting] a greenlight" on the gangs' members, so East Side Riva members were being assaulted in jails. The Mexican Mafia directed East Side Riva not to cooperate with African Americans ever again. In the years that followed, the violence between East Side

---

[1]     Consistent with his membership in a Hispanic gang, the probation report identifies Carrillo's race as Hispanic.

3

Riva and 1200 Block became "astronomical." East Side Riva and 1200 Block became "mortal enemies."

During a wiretap operation in 2018, officers learned that East Side Riva members were calling 1200 Block members "snails," which is a derogatory term or a "dis name." It was East Side Riva's way of calling 1200 Block members "the 'N' word" without using the word. East Side Riva started using the term to describe African Americans more generally, regardless of whether a person was a 1200 Block member. There were also several high-profile murders committed by East Side Riva members in which the victims were African American but not gang members. Nongang members were being shot merely for being the "wrong race on the wrong street." According to the People's gang expert: "It's to the point now, that if you investigate a crime in the east side Riverside neighborhood, and the victim is Mexican, you assume you're looking for a black suspect and vice versa."

B.    *The shooting*

Isaiah testified at trial, and many of the events were captured on surveillance video at a Motel 6. Isaiah and Thomas did not live in Riverside but were in town to visit Isaiah's grandmother. She was staying at the Motel 6. Isaiah and Thomas, both African Americans, were driving Isaiah's car. Isaiah was carrying a nine-millimeter semiautomatic gun that belonged to Thomas, and Thomas was carrying a .45-caliber gun. The two men were not gang members. But Thomas was once found in the company of gang members during an encounter with investigators in Rialto, California.

4

Isaiah was born in Riverside, and he had heard of East Side Riva. He knew that the gang "didn't mess with black people," meaning that the gang members did not associate with and did not like African Americans.

When Isaiah and Thomas arrived at the Motel 6, Isaiah's grandmother was upset about something that had happened earlier.[2] She was animated and yelling about the incident that had upset her. As Isaiah, his grandmother, and Thomas were leaving to get food, his grandmother pointed out the people involved in the upsetting incident; they were in a black Jaguar that was driving through the parking lot. Carrillo was a registered guest at the motel and was driving the Jaguar. He had three other individuals with him.

Someone in the Jaguar said something to Isaiah's group, but Isaiah could not hear what the speaker said. Carrillo also made some sort of hand gesture consistent with "throwing a hand sign." The Jaguar circled around the motel and eventually returned to the area where Isaiah, his grandmother, and Thomas were getting into Isaiah's car. Isaiah's grandmother paused and stared at the Jaguar, and Isaiah and Thomas motioned to her and encouraged her to get into the car. Isaiah testified that there was nothing about the situation that he was "trying to get away from," and he was not scared or intimidated; he told his grandmother to get in the car because he was ready to go.

Meanwhile, Carrillo stopped his Jaguar in the middle of the parking lot, went upstairs to his motel room for a short period, and returned to the Jaguar. As he got back into the car, he appeared to pull a gun from his waistband.

---

[2]    Isaiah's grandmother died before Carrillo's trial. Her death was unconnected to this case. Like Isaiah, his grandmother was African American.

While Carrillo was upstairs, the Jaguar was blocking the exit to the right of Isaiah's parking spot. Isaiah instead drove left, in the opposite direction of the Jaguar, which was "the fastest way out" of the motel parking lot. There was no reason to drive toward the Jaguar. When a detective interviewed Isaiah at the hospital right after the shooting, Isaiah said that he was initially going to drive toward the Jaguar, but he took "the other way" out of the parking lot because he did not want any conflict.

Isaiah turned right out of the parking lot and waited at a red light before making a left turn onto University Avenue. Thomas was in the front passenger seat, and Isaiah's grandmother was in the back seat. Carrillo's Jaguar pulled out of the motel parking lot just as Isaiah was turning left onto University Avenue. By the time Carrillo got to the intersection, the light was red again, but he ran the red light to make a left turn, following Isaiah.

Carrillo caught up to Isaiah as Isaiah was waiting to turn left at another red light on University Avenue. The Jaguar pulled up to Isaiah's passenger side. The window of the Jaguar rolled down, and the person in the Jaguar yelled something at Isaiah's group. Isaiah could not recall exactly what the person said, but Isaiah's group was being "gangbanged on." Isaiah saw the person in the Jaguar cock a gun, and Isaiah's group "started getting shot at."[3]

Isaiah's gun was in his pocket. He took the gun out of his pocket "after things were said" and held it next to his hip, but he did not shoot at the Jaguar. He was scared

---

[3]     Isaiah has never identified the person in the Jaguar.

and worried about getting out of the situation. He did not know whether Thomas shot at the Jaguar. But Isaiah turned left to flee from the situation, and he crashed his car. He and Thomas got out of the car and sought help. Isaiah had a gunshot wound on his leg near his groin, and Thomas was shot twice.

When officers arrived at the scene, Isaiah was cooperative. He asked for help and surrendered his gun. An officer removed the gun from Isaiah's front pants pocket. Isaiah insisted that he never fired the gun, but he acknowledged that it was possible that the gun went off accidentally in his pocket. There were bullet holes in Isaiah's pants pocket and the bottom of his sweatshirt, indicating that the gun went off in his pocket and that he inflicted the gunshot wound on himself.

Thomas died of a gunshot wound to his torso. The bullet entered in the area of his right armpit and traveled left, hitting both lungs and causing him to bleed out internally. It was more likely than not that Thomas's arm was in a raised position when the bullet entered his body.

Officers found Thomas's .45-caliber gun between the door and the front passenger seat in Isaiah's car. They also found ten .45-caliber shell casings at the intersection where the shooting occurred.

C. *Investigation of Carrillo*

Childers, the People's gang expert, was one of the detectives who investigated the shooting. When he arrived at the scene, he learned that the suspect vehicle was a black Jaguar. Childers was familiar with Carrillo from a prior investigation and knew that Carrillo drove a black Jaguar. The prior investigation occurred months before the

7

shooting, and Childers had searched Carrillo's cell phone as part of that prior investigation. The cell phone contained a number of images indicating that Carrillo was a CLPS member. In one photo, Carrillo was holding a shotgun, and the caption stated, "'Cruising with a snail gauge. Ready for the funk.'" "Funk" meant "fight." Another photo showed a shirt that stated, "'Choppa in the trunk'" and "'I'll leave a snail missing.'" "Choppa" referred to a gun. There was also a photo of Carrillo with the caption, "'Georgia Street Mob killer.'"

The prosecutor asked Childers if, after hearing the description of the suspect vehicle, he did anything to determine whether Carrillo was involved in the shooting. The detective replied: "I already immediately upon hearing black Jaguar, I already suspected Mr. Carrillo. Like I said earlier, I kind of talked about how the gang issues on the east side, if you have black victims, then you're looking for [a] Hispanic suspect. With a couple of pieces, it led me to Mr. Carrillo. The fact that I knew he drove a black Jaguar, the fact that my victims were black, I suspected it was him immediately. So I started looking for law enforcement contacts for him specifically and was able to find a traffic stop where he'd been detained, and I think issued a citation with another passenger in the car, … in the black Jaguar, and that's how I got the license plate." Childers then obtained the surveillance video from the motel and confirmed that the suspect vehicle indeed belonged to Carrillo.

Childers also identified the three individuals shown with Carrillo in the surveillance video, whom he knew to be CLPS associates. They were actively trying to earn membership in the gang.

8

Carrillo went to Tijuana, Mexico right after the shooting and then to Las Vegas, Nevada. He was eventually arrested at his mother's home. After his arrest, officers searched his room at the house. There were gang "indicia" written all over the walls of his room, and there was a backpack containing "a massive amount of notes." Graffiti in Carrillo's room stated, "Fuck Snails" and "1200," with a "K" after the "1200." The "K" stood for "killer," so the graffiti meant "1200 killer." Other graffiti stated, "GSM" with a "K" after it, referring to the GSM clique within the 1200 Block gang.

Some of the notes in the backpack concerned getting rid of a cell phone or removing the "chip" from the cell phone. There was also an itinerary for fleeing the country, including details about obtaining cash, packing clothing, going to the airport, and leaving phones behind. Similarly, another note concerned "'going into hiding'" and stated, "'No phones. No physical contact.'" Other notes stated, "'1200 Block killer'" and "'Georgia Street Mob Killer.'" Another note appeared to be Carrillo giving himself high marks for a "'shootout'" with "'some snails'" on "'Day 1.'" The note said, "'Wino, three out of three, A plus, 1200K.'" He appeared to believe that the three victims (Isaiah, his grandmother, and Thomas) were associated with 1200 Block, even though they were not. The note continued, "'Snails will never take a real one down. I'm too much of a killa. I'm a warrior. Primos.'" The note then said, "'Day 2, I'm on the run LOL.'"

After Carrillo's arrest, law enforcement conducted a "Perkins operation" in which

Carrillo was placed in a cell with undercover agents.[4]  The operation was audio and video recorded.  Carrillo introduced himself to the undercover agents as "Wino from Eastside Riva Primos gang."  Detectives came to the cell and told Carrillo that they knew he was involved in the shooting.  They confronted him with some evidence and said that they were waiting for an interview room.  The officers then left, and Carrillo told the undercover agents that "they shot at me first."  According to Carrillo, the shooters pulled up next to him, and he was looking at the stoplight when he heard, "pop, pop, pop."  He reached for his gun—a .40-caliber Glock—and exchanged fire with the shooters.  He described it as "justifiable homicide."  One of the undercover agents asked, "Why'd you guys get into it, though?  Like, what the fuck started it?"  Carrillo responded, "'Cause they were some n*****s, and shit."  He also said that some "black bitch" at the motel was next to his car, but he "wasn't even arguing with her"; he merely told her to "back up bitch."

Detectives collected Carrillo from the cell and interviewed him.  He told the detectives that two days before the shooting, he had "a very small confrontation" with an African-American woman at the motel, because she was standing too close to his car and "being really weird."  He told the woman to get away from his car, and she began "yelling and saying all this stuff."  On the day of the shooting, the same thing happened—she was too close to his car, and he told her to get away from it.  Later that

---

[4]    *Illinois v. Perkins* (1990) 496 U.S. 292 held that an undercover officer posing as a fellow inmate need not give warnings under *Miranda v. Arizona* (1966) 384 U.S. 436 "before asking questions that may elicit an incriminating response."  (*Perkins*, at p. 300.)

day, Carrillo saw the woman come out of her room with two men.  The two men looked like gang members and were staring at Carrillo and his friends.  One of the men pulled up his shirt and "flashed the strap" at Carrillo.

The woman and the two men left, and Carrillo and his friends were about to leave as well.  But Carrillo remembered that he had forgotten his "blunts," so he went upstairs to get them before leaving.  Carrillo drove down the street and was stopped at a light when the men from the motel pulled up on his left.  They were "mad doggin' [and] saying some stuff."  Carrillo rolled down his window and said, "what's up," but the men looked away and did not reply.  Carrillo rolled his window up and turned back to the stoplight, and "outta nowhere" he heard gunshots.  The men were shooting at his car, so he grabbed a gun that was under his seat and fired back two to three times.  He fled, running a red light to get away.  Carrillo insisted that the men shot at him first and that he and his friends "all would've died" if he had not returned fire.

After Carrillo told the detectives what had happened, they said that the surveillance video did not show the man at the motel motioning to his waistband or flashing a gun at Carrillo.  They also told Carrillo that the video showed him running upstairs and pulling a gun out of his pocket as he reentered his car.  Carrillo then admitted that he ran upstairs to get the gun.  He said that he did so because he was nervous, and "they were kinda staring at us."  He further explained that in Riverside, "Mexicans and blacks they don't get along."  He said that was the case whether "they're gang bangin' or

11

not."[5]  He also acknowledged that he "racked" his gun in view of the window.  Carrillo said that he threw his gun out of the car when he was driving, but he did not remember where.  His car was at his mechanic's shop, but he did not know where that was either.

Law enforcement found Carrillo's Jaguar one and one-half months after the shooting.  There were roughly 10 bullet holes on the driver's side of the car.  There were two .40-caliber shell casings inside the Jaguar but none found at the scene of the shooting.  The driver's side window appeared to have been shot, but it was unclear if the bullet came from inside or outside the car.  The window could have been rolled all the way up or only partially up when the bullet struck.  Investigators never found Carrillo's gun.

## II.     *Verdict and sentencing*

The jurors found Carrillo guilty of first degree premeditated murder and attempted premeditated murder, but they acquitted him on a third count charging attempted murder of Isaiah's grandmother.  (§§ 187, 189, subd. (a), 664.)  With respect to the murder count, the jury found true a gang-murder special circumstance, a hate-crime special circumstance, and a drive-by shooting special circumstance.  (§ 190.2, subd. (a)(16), (a)(21), (a)(22).)  With respect to the murder and attempted murder counts, the jury found that Carrillo personally and intentionally discharged a firearm (causing death in the case of the murder count).  (§ 12022.53, subds. (c), (d).)  On the People's motion, the court

---

[5]     One of the law enforcement witnesses explained that the term "gangbanging" referred to gang members trying to intimidate others.

dismissed a bifurcated gang enhancement attached to the attempted murder count. (§ 186.22, subd. (b)(1)(C).)

The court sentenced Carrillo to life in prison without the possibility of parole on the murder count, plus 25 years to life for the associated firearm enhancement. On the attempted murder count, the court sentenced Carrillo to a concurrent term of seven years to life, plus 20 years for the associated firearm enhancement.

DISCUSSION

I.     *Racial Justice Act*

Carrillo argues that certain testimony by Childers violated the RJA and Carrillo's due process rights. We conclude that Carrillo forfeited the RJA and due process challenges and that defense counsel did not render ineffective assistance by failing to raise the RJA claim.

Carrillo bases his argument on two of Childers's statements. First, when the detective described the history of racial violence in the area, he stated: "It's to the point now, that if you investigate a crime in the east side Riverside neighborhood, and the victim is Mexican, you assume you're looking for a black suspect and vice versa." Second, when the prosecutor asked if the detective did anything to determine whether Carrillo was involved in the shooting, the detective stated: "I already immediately upon hearing black Jaguar, I already suspected Mr. Carrillo. Like I said earlier, I kind of talked about how the gang issues on the east side, if you have black victims, then you're looking for [a] Hispanic suspect. With a couple of pieces, it led me to Mr. Carrillo. The fact that

I knew he drove a black Jaguar, the fact that my victims were black, I suspected it was him immediately."

"The Legislature passed the RJA in 2020 with a stated aim 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' [Citation.] To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin." (*People v. Wilson* (2024) 16 Cal.5th 874, 944-945.) As relevant here, the defendant may establish a violation of the RJA by proving by a preponderance of the evidence that a law enforcement officer or expert witness "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin" or "used racially discriminatory language about the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1), (2).) "The defendant does not need to prove intentional discrimination." (*Id.*, subd. (c)(2).) "'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (*Id.*, subd. (h)(4).) Courts "must carefully consider context when determining whether particular statements violate the RJA." (*People v. Bankston* (June 1, 2026, S044739) __ Cal.5th __ [2026 Cal. Lexis 3006, p. *140] (*Bankston*).) If the defendant files an RJA motion in the trial court and makes a prima facie showing of a violation, then the court shall hold a hearing. (§ 745, subd. (b).) "A

14

motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation.  A motion that is not timely may be deemed waived, in the discretion of the court."  (*Id.*, subd. (c).)  For claims based on the trial record, the defendant may raise the RJA claim on direct appeal from the judgment.  (§ 745, subd. (b).)

Carrillo forfeited his RJA and due process claims by not raising them in the trial court.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 731; *People v. Gomez* (2026) 118 Cal.App.5th 384, 391-392; *People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1219.)  Section 745 states that RJA claims based on the trial record may be raised on direct appeal, but the statute does not provide that they may be raised "for the first time" on direct appeal.  (*People v. Lashon* (2024) 98 Cal.App.5th 804, 812, italics omitted.)  Rather, an RJA claim, "like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court."  (*Lashon*, at p. 812.)  "It makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating [an RJA] motion at the trial level (including a specific waiver provision for untimely motions), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue an [RJA] claim for the first time on direct appeal."  (*Id.* at p. 813.)

Carrillo argues that if he forfeited his RJA claim, then defense counsel rendered ineffective assistance by failing to bring an RJA motion in the trial court.  But any such motion would have been meritless.  Defense counsel did not perform deficiently by

15

failing to bring a meritless RJA motion. (*People v. Quintero* (2024) 107 Cal.App.5th 1060, 1078; *People v. Singh* (2024) 103 Cal.App.5th 76, 117-119.)

Childers testified about the history of racial violence between East Side Riva and 1200 Block, and he explained that members of both gangs had come to target victims because of their race, regardless of whether the victims were gang members. Carrillo acknowledges that "it may have been proper" for Childers to provide a historic account of the conflict between the African-American and Hispanic gangs in the area. He also appears to acknowledge that evidence of his and his gang's racial animus toward African Americans was relevant to show his motive, intent to kill, and the necessary intent or motive for the gang-murder and hate-crime special circumstances. But Carrillo asserts that Childers "went too far" by "admitting that he and other investigators in Riverside commonly use the race or ethnicity of a crime victim to make racist assumptions about the identity of the perpetrator."

The record demonstrates, however, that Childers's statements were not based on racist assumptions. Rather, they were based on the undisputed evidence of longstanding racial violence and animus in the area. Childers's statements must be read in context of that evidence and not in isolation. (See *Bankston*, *supra*, Cal. Lexis 3006 at pp. *130-*131 ["Considering the context, an objective observer would not have understood" the gang expert's "description of the organizational culture and activities of 'Black gangs' as an appeal to implicit racial bias, but instead as a way of conveying his knowledge of the organizational culture and activities of the group of gangs to which" the defendant belonged].)

16

Carrillo relies primarily on *People v. Stubblefield* (2024) 107 Cal.App.5th 896 (*Stubblefield*), disapproved on another ground by *Bankston*, *supra*, Cal. Lexis 3006 at p. *169, fn. 15, to show that Childers's statements constituted an RJA violation, but *Stubblefield* is inapposite. The prosecutor in that case mentioned the defendant's race in closing argument when the prosecutor was attempting to explain why the police failed to search the defendant's house. (*Id.* at pp. 918-919.) He told the jurors that there was no search because the victim had not identified the defendant, the defendant was famous, and the defendant was African American. (*Ibid.*) The prosecutor argued that a search under those circumstances would "'open up a storm of controversy'" and stated, "'Can you imagine in Morgan Hill when they search an African-American—,'" before defense counsel objected. (*Id.* at p. 919, italics omitted.)

Closing arguments in the case took place in July 2020, "eight weeks after a white police officer murdered George Floyd, setting off weeks of massive protests and nationwide social unrest." (*Stubblefield*, *supra*, 107 Cal.App.5th at p. 903.) There was no evidence in the record regarding "Floyd's killing or the post-Floyd conflict," but the *Stubblefield* court took judicial notice of those facts under Evidence Code sections 451 and 459. (*Stubblefield*, at pp. 914-915.)

The *Stubblefield* court held that the prosecutor's argument explicitly or implicitly appealed to racial bias and constituted racially discriminatory language within the meaning of the RJA, reasoning: "The prosecution explicitly asserted Stubblefield's race was a factor in law enforcement's decision not to search his house. The statement implied the house might have been searched and a gun found had Stubblefield not been

17

Black, and that Stubblefield therefore gained an undeserved advantage at trial because he was a Black man. Second, the claim that a search would 'open up a storm of controversy' implicitly referenced the events that followed George Floyd's then-recent killing, appealing to racially biased perceptions of those events and associating Stubblefield with them based on his race." (*Stubblefield*, *supra*, 107 Cal.App.5th at p. 903; *id.* at pp. 919-920.) The court further observed that there was no evidence that the defendant's race played any role in law enforcement's decision not to search the house, that the search would have opened up a storm of controversy, or that the police contemplated that possibility. (*Id.* at p. 919.) "But even if there had been evidence to support those claims, the argument served no valid or permissible legal purpose or theory of relevance." (*Ibid.*)

Unlike *Stubblefield*, this is not a case in which the defendant's race was entirely irrelevant or in which mention of his race served no proper purpose. (*Stubblefield*, *supra*, 107 Cal.App.5th at p. 919.) As already explained, Carrillo's race and the race of the victims were relevant to elements of the charged offenses or special circumstances. Their respective races were also relevant to Carrillo's theory of self-defense. For instance, Carrillo told officers that he ran upstairs to get a gun from his motel room because Isaiah and Thomas were staring at him, he was nervous, and "Mexicans and blacks" in Riverside "don't get along." In other words, Carrillo claimed to be nervous and in need of a deadly weapon because of the victims' race and the conflict between the races in east Riverside. In this context, Childers's statements that he considered Carrillo's race was an appeal to evidence properly before the jury, not an appeal to racial bias or an exhibition

18

of racial bias. The RJA does not prohibit any and all references to the defendant's race or ethnicity by an expert witness or law enforcement officer involved in the case. Indeed, the act expressly states that it "shall not prevent the prosecution of hate crimes" (§ 745, subd. (g)), recognizing that there are cases in which the defendant's race or the race of the victims will be relevant and may be considered without violating the RJA. In order to constitute a violation of the RJA, the challenged statements must "exhibit[] bias or animus" toward the defendant because of their race or ethnicity (§ 745, subd. (a)(1), (2)) or "explicitly or implicitly appeal[] to racial bias" (*id.*, subd. (h)(4)). (See *Bankston*, *supra*, Cal. Lexis 3006 at pp. *139-*140 [the RJA states that racially discriminatory language includes language comparing the defendant to an animal, but animal imagery that does not "'explicitly or implicitly appeal[] to racial bias'" is not prohibited by the RJA].) That was not the case with Childers's statements.

In sum, Carrillo forfeited his RJA and due process claims, and defense counsel did not render ineffective assistance by failing to raise the meritless RJA claim.

II.     *Testimony regarding Isaiah's honesty*

The prosecutor asked the detective who interviewed Isaiah at the hospital whether he felt "as though [Isaiah] was being honest and trustworthy" during the interview. The detective replied in the affirmative. Carrillo argues that the court prejudicially erred and violated his right to due process by admitting improper opinion testimony regarding Isaiah's honesty. We conclude that Carrillo forfeited the argument. In addition, defense counsel's failure to preserve the argument did not constitute ineffective assistance.

19

In general, "a lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide." (*People v. Houston* (2012) 54 Cal.4th 1186, 1221.) Thus, "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744.) "With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence." (*Ibid.*)

"'"[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal."'" (*People v. Williams* (2008) 43 Cal.4th 584, 620.) Accordingly, failure to preserve the specific claim of evidentiary error forfeits the challenge on appeal. (*People v. Oyler* (2025) 17 Cal.5th 756, 831.)

Defense counsel objected to the prosecutor's question about Isaiah's honesty on the ground that it called for speculation, and the court overruled that objection. But counsel did not raise an improper opinion objection or a due process objection. Carrillo therefore forfeited the challenges. (*People v. Oyler*, *supra*, 17 Cal.5th at p. 831 [the defendant forfeited relevance, undue prejudice, and improper character evidence challenges by raising only a hearsay objection in the trial court].)

Carrillo argues that to the extent that he forfeited the challenges, defense counsel rendered ineffective assistance by failing to raise the specific objections. "To demonstrate ineffective assistance of counsel, [the defendant] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.) Counsel's deficient performance is prejudicial if

"there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)

The People concede that the detective's testimony regarding Isaiah's honesty was improper opinion testimony, and we agree. (*People v. Houston*, *supra*, 54 Cal.4th at p. 1221.) Nevertheless, any deficient performance by failing to raise the improper opinion objection was not prejudicial. It is not reasonably probable that Carrillo would have obtained a more favorable result absent the challenged testimony.

The court admitted only 38 seconds of Isaiah's recorded interview at the hospital. In those 38 seconds, Isaiah said that when he was leaving the motel parking lot, he was going to drive toward the stopped Jaguar, but he took the other exit because he did not want any conflict. Carrillo contends that the statement was inconsistent with Isaiah's trial testimony—Isaiah testified that he took his exit route because it was the fastest, and there was no reason to go the other way. Carrillo argues that Isaiah's interview statement about avoiding conflict gave rise to an inference that Isaiah felt threatened by Carrillo. And after the detective testified that he believed Isaiah's statements to be honest and trustworthy, the jurors were likely to conclude that Isaiah did feel threatened and to reject Carrillo's self-defense theory on that basis.

But the evidence that Carrillo was not acting in lawful self-defense was strong, regardless of Isaiah's reasons for choosing his exit route. First, the evidence of Carrillo's animus toward African Americans and his willingness to use violence against them was overwhelming. For instance, he referred to himself as a killer of 1200 Block, the Georgia

21

Street Mob clique, or "snails" (a derogatory term for 1200 Block and African Americans more generally). He called a shotgun a "'snail gauge'" and said that he was ready for a fight. He used a racial slur when talking about Isaiah and Thomas to the undercover agents, saying that he got "into it" with the victims because of their race. Notes found in his backpack after the shooting referred to the shootout with "snails," and he gave himself high marks for it. All of that evidence shows that Carrillo targeted the victims and intended to kill them because of his animus toward them, not because he believed that his life was in danger.

Second, Carrillo's claim that the victims were trying to intimidate him or threaten him is not supported by the video evidence. Carrillo said that one of them lifted his shirt and flashed a gun at Carrillo, but the video shows no such conduct. He also claimed that they followed him and pulled up to his car at the stoplight. But the video shows that Isaiah left first, Carrillo ran a red light to catch up, and Carrillo pulled up to Isaiah's car. The video further shows that before following Isaiah, Carrillo retrieved a gun from his room.

Carrillo emphasizes that Isaiah never said that Carrillo shot first, whereas Carrillo told the undercover agents and the interviewing officers that the victims shot first. However, the jurors could reasonably infer from the evidence that Carrillo shot at the victims first. Isaiah testified that the person in the Jaguar "gangbanged" on his group and cocked a gun, and then he and his companions "started getting shot at." And even if Thomas shot at Carrillo first, Carrillo acknowledged that he "racked" his gun in view of the car window, just as Isaiah said. The court instructed the jurors that the right to self-

22

defense may not be contrived (CALCRIM No. 3472)—that is, self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Enraca* (2012) 53 Cal.4th 735, 761.) The prosecutor accordingly argued in her closing argument: "Let's say hypothetically [Thomas] did shoot first, so what. You don't get to create your own scenario where then you get to claim self-defense, and that makes sense." Similarly, she argued in rebuttal: "And although the defendant wants you to believe that he shot second, and therefore, is entitled to self-defense, that's not the law. That's not the law. The law, in fact, is if you create the circumstances that then require you to use deadly force, right, you don't get to set up your own set of circumstances. That makes sense."

In light of the evidence that Carrillo provoked Thomas to use deadly force, we are not persuaded that the evidence that Thomas shot first rendered the case close. The evidence that Carrillo was not acting in lawful self-defense was strong, regardless of Isaiah's reasons for choosing his exit route. Indeed, the prosecutor did not mention in her closing or rebuttal argument that Isaiah chose his exit route to avoid conflict.

On this record, the admission of the detective's testimony regarding Isaiah's honesty was harmless. It is not reasonably probable that absent the testimony, the jurors would have concluded the People failed to prove that Carrillo was not acting in lawful self-defense. Carrillo therefore has not established that defense counsel rendered ineffective assistance by failing to raise an improper opinion objection.

23

Moreover, Carrillo fails to establish that defense counsel rendered ineffective assistance by failing to raise a due process objection. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) The trial was not rendered fundamentally unfair by admission of the challenged testimony, particularly in light of both the strong evidence that Carrillo was not acting in lawful self-defense and the relative insignificance of Isaiah's statement that he wanted to avoid conflict. A due process objection therefore would have been meritless, so defense counsel did not perform deficiently by failing to raise it. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463 ["Representation does not become deficient for failing to make meritless objections"].)

In sum, Carrillo forfeited his challenge to the detective's testimony regarding Isaiah's honesty, and defense counsel's failure to preserve the challenge did not constitute ineffective assistance.

III.    *Instruction regarding the hate-crime special circumstance*

Carrillo argues that the court erroneously instructed the jury on the motive element of the hate-crime special circumstance by giving conflicting instructions on motive. He contends that the error violated his right to due process. We agree, but the error was harmless beyond a reasonable doubt.

A.    *Relevant background*

The court gave the jurors the pattern jury instruction on motive, CALCRIM No. 370. In relevant part, the instruction stated: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged, allegations alleged, or

24

special circumstances alleged. In reaching your verdict you may, however, consider whether the defendant had a motive."

With respect to the special circumstances generally, the court instructed the jurors pursuant to CALCRIM No. 705 that "the People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent or mental state." And the instruction for the hate-crime special circumstance (CALCRIM No. 729) stated: "To prove that this special circumstance is true, the People must prove that the defendant intended to kill because of the deceased person's race, color, religion, or nationality. [¶] If the defendant had more than one reason to commit the murder, the deceased person's race, color, or nationality must have been a substantial factor motivating the defendant's conduct. A substantial factor is more than a trivial or remote factor, but it does not need to be the only factor that motivated the defendant."

B.    *Analysis*

"Motive is not generally an element of a criminal offense. But when it *is* an element, the trial court errs by giving an unmodified version of CALCRIM No. 370, an optional instruction that tells the jury the prosecutor need not prove the defendant's motive to commit the charged crimes." (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1165 (*Valenti*).) When the court correctly instructs the jury regarding the motive element in one instruction and also gives the unmodified version of CALCRIM No. 370, then "we have 'no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.'" (*Valenti*, at p. 1165.) The conflicting instructions effectively remove the motive element from the jury's consideration. (*Ibid.*) Consequently, the

25

bench notes for CALCRIM No. 370 state that the court should "[m]odify this instruction as needed if motive is an element of some, but not all, of the crimes or special circumstances charged or enhancements alleged."

The error removing the motive element from the jury's consideration constitutes a violation of the defendant's constitutional right to due process (*Valenti*, *supra*, 243 Cal.App.4th at pp. 1164-1165), so the error is prejudicial unless the People prove that it was harmless beyond a reasonable doubt. (*Id.* at pp. 1165-1666; *Chapman v. California* (1967) 386 U.S. 18, 24; accord, *People v. Schuller* (2023) 15 Cal.5th 237, 257 (*Schuller*) [*Chapman* standard applies to instructional errors "that omit an element of the offense, but also to instructions that provide an incomplete or misleading description of what is necessary to establish an element of the offense"].)

As a preliminary matter, although defense counsel did not object to the conflicting instructions on motive, the People concede that Carrillo did not forfeit the challenge. We agree. Carrillo claims that the instructional error affected his "substantial rights" because it removed an element of the special circumstance from the jury's consideration. (§ 1259.) The "claim therefore is not of the type that must be preserved by objection."[6] (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

The court erred by giving the unmodified version of CALCRIM No. 370, which instructed the jurors that the People were not required to prove that Carrillo had a motive

---

[6] Given our conclusion that Carrillo did not forfeit the challenge, we need not address his alternative argument that defense counsel rendered ineffective assistance by failing to object to the conflicting motive instructions.

26

to commit any of the special circumstances alleged.  The hate-crime special circumstance required proof of a motive, namely, that the defendant intentionally killed the victim "because of his or her race, color, religion, nationality, or country of origin."  (§ 190.2, subd. (a)(16).)  The defendant's "'bias motivation must be a cause in fact of the offense.'"  (*People v. Lindberg* (2008) 45 Cal.4th 1, 38.)  If "multiple concurrent motives exist, the prohibited bias must be a substantial factor in bringing about the crime."  (*Ibid.*)

We nevertheless conclude that the instructional error was harmless beyond a reasonable doubt.  Reversal is required unless we conclude that no "rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the" required finding, absent the instructional error.  (*Schuller*, *supra*, 15 Cal.5th at p. 244.)  We do not ask whether a reasonable jury could have found that the defendant acted with the requisite motive, "but rather, 'whether any rational fact finder could have come to the *opposite* conclusion."  (*Valenti*, *supra*, 243 Cal.App.4th at p. 1166.)

The People argue that the error was harmless beyond a reasonable doubt because the evidence that Thomas's race was a substantial factor motivating Carrillo "was not just overwhelming, but ironclad."  The People point to the evidence of Carrillo's membership in the gang; the cross-racial gang violence; Carrillo's repeated references to African Americans and the victims as "snails," a derogatory term for their race; and Carrillo's statement that the conflict started because the victims "were some n*****s, and shit."

No rational fact finder who heard the foregoing evidence and made the findings reflected in the verdict could have had reasonable doubt that Thomas's race was a

27

substantial factor motivating Carrillo. The evidence cited by the People indeed is overwhelming. As for evidence supporting the contrary conclusion, Carrillo asserts that he consistently explained that he shot at the victims because they shot at him first. He also contends that there was evidence that the conflict arose because Isaiah's grandmother got too close to Carrillo's car.

First, evidence that Carrillo may have had other reasons for committing the murder did not preclude the jury from finding that Thomas's race was a substantial factor motivating the murder. (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 38.) Second, the evidence that Thomas shot first does not persuade us that the instructional error was not harmless beyond a reasonable doubt. The jurors rejected Carrillo's lawful self-defense theory when they convicted him of premeditated and deliberate murder, meaning that they found that the People had proven that Carrillo was not acting in lawful self-defense. (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 571 ["the prosecution has the burden to prove a defendant did not act in self-defense, because self-defense negates an element of the offense"].) We assume for purposes of the prejudice analysis that the jurors credited the evidence that Thomas shot first. To both credit the evidence that Thomas shot first and reject the self-defense theory, the jurors would have to conclude that Carrillo did not have the right to invoke self-defense, because Carrillo provoked the gunfight "with the intent to create an excuse to use force."[7] (CALCRIM No. 3472.) No rational juror who

---

[7] The contrived self-defense instruction (CALCRIM No. 3472) that the court gave stated in its entirety: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and

(1) found that Carrillo provoked the gunfight intending to create an excuse to use force, (2) found that he intended to kill Thomas, (3) found that he killed Thomas with premeditation and deliberation, and (4) heard the extensive evidence of Carrillo's racial animus could have had reasonable doubt that Thomas's race was a substantial factor motivating Carrillo.

Third, the evidence that Carrillo was upset because Isaiah's grandmother got too close to the Jaguar could explain his reasons for confronting her earlier in the day or the day before the shooting. But Carrillo never said that he shot Thomas because of the grandmother's earlier actions. And his statement about that incident provided further evidence of his racial bias—he called her the "black bitch" when talking to the undercover agents. The evidence does not persuade us that a rational juror would have concluded that the People failed to prove that racial bias motivated the murder.

For these reasons, we conclude that the court erroneously instructed the jury concerning the motive element of the hate-crime special circumstance, but the error was harmless beyond a reasonable doubt.[8]

---

deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting."

[8] Carrillo argues that even if no error was prejudicial alone, the cumulative effect of the asserted errors rendered his trial fundamentally unfair, requiring reversal of his convictions. We have concluded that there were two errors—admission of the improper opinion testimony regarding Isaiah's honesty, and the erroneous instruction on the motive element of the hate-crime special circumstance. The cumulative effect of those two errors does not warrant reversal of Carrillo's convictions. (*People v. Woodruff* (2018) 5 Cal.5th 697, 783; *People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

IV.     *Correction of clerical errors concerning sentencing*

The parties point out that the sentencing minute order and the abstract of judgment do not accurately reflect the court's oral pronouncement of Carrillo's sentence. We agree, so we direct the court to correct the minute order and the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

The court ordered concurrent sentences for the murder (count 1) and the attempted murder (count 2). On count 1, the court ordered a sentence of life in prison without the possibility of parole, plus 25 years to life for the associated firearm enhancement. On count 2, the court ordered a sentence of seven years to life, plus 20 years for the associated firearm enhancement.

The sentencing minute order erroneously states that the sentences on the two counts are consecutive, so the trial court should correct that on remand. The minute order states the correct sentences on each count but then also states: "Sentenced to State Prison for a total Indeterminate sentence of 37 Years TO LIFE. [¶] Sentenced to State Prison for a determinate sentence of 20 yrs 0 mos plus indeterminate sentence of LIFE without the possibility of parole." Carrillo's sentence does include a determinate term of 20 years (for the firearm enhancement in count 2) and an indeterminate term of life without the possibility of parole (for the count 1 offense), but the statement that he had a total indeterminate term of 37 years to life is incorrect. On remand, the court should also correct that statement in the minute order.

In addition, the abstract of judgment for Carrillo's indeterminate terms also contains a clerical error. The form states that the sentence on count 1 is concurrent to the

30

sentence on count 2, but it fails to state Carrillo's sentence for murder on count 1. Specifically, the form contains a check box next to "life without the possibility of parole" (section four) that is empty. (Capitalization omitted.) The court should also correct the abstract of judgment on remand.

## DISPOSITION

The trial court is directed to prepare a corrected sentencing minute order to reflect that (1) the sentences on counts 1 and 2 are concurrent and (2) the court did not impose a total indeterminate term of 37 years to life. The court is also directed to prepare a corrected abstract of judgment for Carrillo's indeterminate terms to reflect his sentence of life without the possibility of parole on count 1. The court shall forward certified copies of the corrected documents to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


MENETREZ
J.


We concur:


CODRINGTON
Acting P. J.

FIELDS
J.

31

Filed 7/28/26

**CERTIFIED FOR PUBLICATION**
**COURT OF APPEAL -- STATE OF CALIFORNIA**
**FOURTH DISTRICT**
**DIVISION TWO**

THE PEOPLE,

      Plaintiff and Respondent,

   v.

STEVEN DANIEL CARRILLO,

      Defendant and Appellant.

_____

E084273

(Super.Ct.No. RIF2003935)

The County of Riverside

**ORDER GRANTING**
**PARTIAL PUBLICATION**

We partially GRANT the requests to publish the opinion filed in this case, which meets the standard for publication in California Rules of Court, rule 8.1105(c). The court orders the opinion filed on June 30, 2026, certified for publication except for parts II through IV of the Discussion. (Cal. Rules of Court, rule 8.1110.)

MENETREZ _____
                                      J.

We concur:

CODRINGTON _____
           Acting P. J.

FIELDS _____
                J.